# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CRYSTAL WILSON, individually and on behalf of all others similarly situated, ) ) ) Plaintiff, ) ) v. ) ) REDBOX AUTOMATED RETAIL, LLC, ) ) Defendant. ) | No. 19-cv-01993<br><br>Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

Since 2007, Plaintiff Crystal Wilson has rented movies from Defendant Redbox Automated Retail, LLC's ("Redbox") automated kiosks. Despite Wilson's express instruction to Redbox on January 23, 2019 that she did not wish to receive text messages from it, Redbox has since sent Wilson numerous automated text messages. Wilson has therefore filed the present lawsuit against Redbox for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Because Redbox contends that Wilson agreed to arbitrate any and all claims she may have against it, Redbox now moves to compel arbitration and stay proceedings here. (Dkt. No. 12.) For the reasons that follow, Redbox's motion is denied.

## BACKGROUND

Redbox rents movies in DVD and Blu-ray disc format to consumers through automated touch-screen rental kiosks located in various retail outlets throughout the United States. (Compl. ¶ 17, Dkt. No. 1-1; Def.'s Mem. in Supp. of Mot. to Compel, Ex. A ("Feldner Decl.") ¶¶ 3–4, Dkt. No. 13-1.) There are two primary ways Redbox customers may rent a movie. First, they may go directly to a Redbox kiosk and select a movie from the available inventory. (Feldner Decl. ¶ 4.) The customer then swipes a payment card and the kiosk dispenses the selected movie. (*Id.*)

Alternatively, customers may create an account on Redbox's website, where they may reserve and pay for a movie and then select a kiosk where they may pick up the selected movie. (Feldner Decl. ¶¶ 4–5; Pl.'s Opp'n to Mot. to Compel, Ex. 1 ("Wilson Decl.") ¶ 4, Dkt. No. 17-2.)

All Redbox services are subject to its Terms of Use, which customers must accept as a condition of their rental. (Feldner Decl. ¶¶ 6–7.) As relevant here, the Terms of Use require Redbox customers to agree to arbitrate "any and all disputes arising from or connected to these Terms, the Redbox Platforms or [any products rented from Redbox]." (Feldner Decl., Ex. 1 at 21/26, Dkt. No. 13-1.) The mandatory arbitration provision was first added to the Terms of Use in an update that took effect in November 2016. Before the updated Terms of Use took effect, Redbox sent an email to over 120 million of its customers advising them of the addition of the mandatory arbitration provision. (Feldner Decl. ¶¶ 9–10; Feldner Decl. Ex. 4, Dkt. No. 13-1.)

When a customer rents directly from a Redbox kiosk, she encounters the Terms of Use just prior to completing the transaction. (Feldner Decl. ¶ 7.) Specifically, she is taken to the "My Bag" screen, as depicted here:



(Feldner Decl., Ex. 2, Dkt. No. 13-1.) The My Bag screen is divided into two columns both with a white background. On the left, a column taking up approximately two-thirds of the screen shows customers the movie or movies they have selected at top along with the rental price. Immediately below the movie selection is fine print setting forth certain rules for Redbox rentals. At the bottom of the left column are two navigational buttons. On the far left, a purple button with white text reads "Back," and on the right side of the left column, a red button with white text reads "Add Movie."

The right column takes up the other third of the screen. The top portion of the right column contains the payment summary, which shows the price the customer must pay for the rental. In the middle of the column is a purple button with white text that reads "Pay Now." Just below the "Pay Now" button in red text is the exclamation "Don't miss your perks!," and underneath that are two white buttons with red text. The first button reads "Sign In" and the second button reads "Add Promos." Both buttons are approximately equal in size to the "Pay Now" button. Immediately below those two buttons appears a button of the same length as the other three right-side buttons but slightly smaller in height. That button is bright red with white text and contains the phrase "Terms & Privacy." When a customer presses the Terms & Privacy button, she is taken to a separate screen setting forth the complete Terms of Use. (Feldner Decl. ¶ 7.) Immediately below the "Terms & Privacy" button is black text slightly smaller than the text in the "Terms & Privacy" button and significantly smaller than the "Don't miss your perks!" text, but larger than the fine print in the left-hand column. That text notifies the customer that "By pressing 'Pay Now' you agree to the Terms." No customer may complete a rental without affirmatively pressing the "Pay Now" button. (*Id.*) The customer can see the entire My Bag screen without any scrolling. The screen has remained substantially the same since at least 2012. (*Id.*)

A customer seeking to initiate a rental online will encounter the Terms of Use on the screen she uses to sign in to her account, as depicted here:



(Feldner Decl., Ex. 3, Dkt. No. 13-1; *see also* Feldner Decl. ¶ 8.) The Sign In screen has a black background. On the left side are boxes where the customer enters her email and password. Just below those two boxes is white all-caps text that reads "REMEMBER ME" and a widget that the user can toggle on or off. Below that widget sits a bright red button with white text that reads "Sign In." And underneath that button is a hyperlink in white all-caps text that reads "FORGOT PASSWORD" followed by the ">" symbol, denoting that the text is a hyperlink. On the right side of the screen are two buttons that the customer may use to sign in to her account using either Facebook or Google.

Centered below the sign-in options is large text that reads "Don't have an account?" and a hyperlink in smaller white all-caps text inviting customers to "JOIN REDBOX PERKS" followed by the ">" symbol, again denoting that the text is a hyperlink. Finally, at the bottom a disclosure informs the user that "By signing in, you are agreeing to the Rewards Terms, and Redbox Terms of Use and Privacy Policy. Payment card required to use rewards rental credit." The text is

roughly the same size as the "REMEMBER ME" and "FORGOT PASSWORD" hyperlinks, but it is not in all caps. In addition, the disclosure text is gray, except for the phrases "Rewards Terms," "Terms of Use," and "Privacy Policy," which appear in white text and hyperlink to separate pages containing the corresponding policies. (Feldner Decl. ¶ 8.)

Wilson has been a Redbox customer since at least October 27, 2007, when she opened a Redbox customer account on Redbox's website. (Wilson Decl. ¶ 3.) From March 2010 through December 2018, Wilson rented over 125 movies from Redbox. (Feldner Decl. ¶ 12.) During that time, Wilson used both the kiosk and website methods of initiating rentals. (*Id.*) Nonetheless, Wilson denies ever agreeing to Redbox's Terms of Use and claims that she was not even aware of their existence. (Wilson Decl. ¶¶ 3, 7.) She also denies ever seeing a disclosure informing her that by signing up for a Redbox account she was agreeing to the Terms of Use. (*Id.* ¶ 3.) Moreover, Wilson claims that when she subsequently signed into her account, she never received notice that she was agreeing to Redbox's Terms of Use by doing so. (*Id.* ¶¶ 8–9.) And Wilson states that when picking up rentals she initiated on Redbox's website, she never encountered a screen that provided notification of or reference to the Terms of Use. (*Id.* ¶¶ 5–6.) For rentals that she initiated at a kiosk, Wilson denies being made aware of or agreeing to Redbox's Terms of Use. (*Id.* ¶¶ 10–11.) Finally, Wilson does not remember having received an email from Redbox advising her of the November 2016 update to the Terms of Use. (*Id.* ¶ 12.)

## DISCUSSION

### I. Requirements for an Enforceable Arbitration Agreement

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995). The Act "embodies both a 'liberal federal policy

5

favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Concepcion*, 563 U.S. at 339 (citations omitted).

Under the Federal Arbitration Act, arbitration must be compelled when the following three elements are established: "a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). This Court reviews a motion to compel arbitration under the summary judgment standard. *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002). Thus, the Court must accept the non-movant's evidence as true and draw all reasonable inferences in her favor. *Id.* If the party opposing arbitration demonstrates that there is a genuine issue of material fact concerning the existence of an agreement to arbitrate, the issue shall proceed to trial. *Id.* However, "[a] trial to determine arbitrability is required . . . only if the issue an evidentiary hearing would resolve is fairly contestable." *Am. Int'l Specialty Lines Ins. Co. v. Elec. Data Sys. Corp.*, 347 F.3d 665, 671 (7th Cir. 2003).

Here, Wilson does not contend that her TCPA claims fall outside the scope of the arbitration agreement. Rather, she claims that there was no contract to arbitrate between her and Redbox. In determining the existence of an agreement to arbitrate, federal courts apply state-law principles of contract formation. *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 711 (7th Cir. 2019). Neither party addressed the choice-of-law issue in their briefs and so the Court will apply the substantive law of the forum state, Illinois. *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011) ("In the absence of [a request to apply the law of a

6

state other than the forum], we apply Illinois law to the question whether the parties agreed to submit disputes to arbitration."). An enforceable contract in Illinois requires "an offer, acceptance, consideration, and mutual assent." *Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011).

Wilson challenges the final element: whether she assented to Redbox's Terms of Use at any time prior to this lawsuit. Illinois courts require "a meeting of the minds or mutual assent to the terms of the contract." *Acad. Chi. Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991). No enforceable contract can be formed where the parties do not share a common understanding of the essential terms of the agreement. *Id.* Courts evaluate mutual assent based on the objective conduct of the parties; their subjective intentions are irrelevant. *Nat'l Prod. Workers*, 665 F.3d at 901. "Under the objective theory, intent to manifest assent in Illinois is revealed by outward expressions such as words and acts." *Sgouros v. TransUnion*, 817 F.3d 1029, 1034 (7th Cir. 2016). Wilson contends that she never received reasonable notice of the Terms of Use—either when she rented movies at a kiosk or when she signed into her Redbox account. Thus, because Wilson did not realize that she was agreeing to the Terms of Use by renting a movie from a Redbox kiosk or signing into her Redbox account, there was no mutual assent to those terms, including the mandatory arbitration provision.

The relevant arbitration provision was first included in the Terms of Use effective in November 2016. Redbox contends that Wilson assented to those terms each time she rented a movie from one of its kiosks and each time she used Redbox's website to sign into her account. Redbox has presented sufficient evidence establishing that Wilson initiated movie rentals both directly at a Redbox kiosk and through Redbox's website since the most recent version of the Terms of Use became effective in November 2016. As a result, Redbox argues that Wilson

7

necessarily agreed to the Terms of Use that included the mandatory arbitration agreement. (Feldner Decl., Ex. 7, Dkt. No. 13-1; Def.'s Reply, Ex. A ("Second Feldner Decl.") ¶¶ 4–5, 7, Dkt. No. 18-1.) Specifically, when initiating rentals at the kiosk, Wilson was advised that by hitting the "Pay Now" button, she was agreeing to Redbox's Terms of Use. Similarly, Redbox's website informed Wilson that by signing into her account, she was agreeing to the Terms of Use. Because there exists no genuine dispute of fact that Wilson encountered both of those screens at some point after the effective date of the November 2016 update to the Terms of Use, the issue can be resolved as a matter of law. *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1102 (7th Cir. 1997) ("Under Illinois law, when the basic facts are not in dispute, the existence of a contract is a question of law.").

While the mutual-assent requirement applies in the context of internet transactions, it is complicated by the fact that many internet users may fail to realize they are agreeing to a contract at all. *Sgouros*, 817 F.3d at 1035. That is the case here, where Redbox does not dispute Wilson's assertion that she was unaware of and never agreed to Redbox's Terms of Use. But while a party to an internet transaction may lack actual knowledge of additional terms and conditions, she may nonetheless have constructive knowledge of those terms where the website provides clear and conspicuous notice of them. *See, e.g.*, *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790–91 (N.D. Ill. 2011) ("[C]larity and conspicuousness of arbitration terms are important in securing informed assent."). "A party has constructive knowledge of a contractual term if she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent. Inquiry notice is actual notice of circumstances sufficient to put a prudent man upon inquiry." *Anand v. Heath*, No. 19-CV-00016, 2019 WL 2716213, at *3 (N.D. Ill. June 28, 2019). In undertaking an constructive-knowledge analysis, courts should consider

8

"whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms." *Sgouros*, 817 F.3d at 1034.

Courts often divide web-based contracts into two different categories, differentiated by the manner in which users demonstrate assent. "Clickwrap" agreements "require users to click an 'I agree' box after being presented with a list of terms and conditions of use." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017). Clickwrap agreements are usually upheld by courts "because they present the consumer with a realistic opportunity to review the terms of the contract ***and*** they require a physical manifestation of assent." *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 465 (S.D.N.Y. 2017). The other category of online contract is the "browsewrap" agreement, which typically involves "a situation where notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via hyperlink." *Van Tassell*, 795 F. Supp. 2d at 790 (internal quotation marks omitted). In other words, a user demonstrates her assent simply by using the website. *Id.* Because a browsewrap agreement requires no affirmative action "by the website user to agree to the terms of a contract other than . . . her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id.*

Many online contracts do not fit neatly into the clickwrap or browsewrap categories but instead share characteristics with both. *Anand*, 2019 WL 2716213, at *3. Such "hybrid" agreements take many forms. Typically, they "prompt the user to manifest assent after merely presenting the user with a hyperlink to the terms and conditions, rather than displaying the terms themselves." *Id.* Thus, a hybrid agreement may resemble a browsewrap agreement in that the

terms and conditions are only available via a hyperlink, while also resembling a clickwrap agreement in that "the user must do something else . . . to assent to the hyperlinked terms." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838 (S.D.N.Y. 2012). As with clickwrap and browsewrap agreements, courts find hybrid agreements enforceable "where the existence of the terms was reasonably communicated to the user." *Meyer*, 868 F.3d at 76.

## II. Clear and Conspicuous Notice of Redbox's Terms of Use

The Court now turns to whether either the Redbox kiosks' My Bag screen or the Sign In screen on Redbox's website gave clear and conspicuous notice of the Terms of Use. To begin, the My Bag and Sign in screens are both hybrid agreements. Neither screen displays the full Terms of Use, but both make them accessible via a hyperlink. Moreover, both screens tie assent to the Terms of Use to some additional action—hitting "Pay Now" for customers using a kiosk or signing into their Redbox account for customers renting online.

Unlike with a clickwrap agreement, for which a customer must expressly agree to the terms and conditions, the affirmative act indicating assent in the hybrid agreements here serves an additional, more prominent purpose. Customers renting a movie from a Redbox kiosk hit "Pay Now" to complete the rental. Customers using Redbox's website click "Sign In" to access their Redbox account. Assent to the Terms of Use is coupled with both acts but it is not the primary purpose of either act. For that reason, this Court must consider "both the law and the facts to see if a reasonable person in the plaintiff's shoes would have realized that [s]he was assenting to a contract." *Gorny v. Wayfair, Inc.*, No. 18 C 8259, 2019 WL 2409595, at *5 (N.D. Ill. June 7, 2019) (internal quotation marks omitted). "The presentation of the online agreement matters: Whether there was notice of the existence of additional contract terms presented on a webpage depends heavily on whether the design and content of that webpage rendered the existence of the

10

terms reasonably conspicuous." *Applebaum*, 263 F. Supp. 3d at 466 (internal quotation marks omitted); *see also Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018) ("[I]n the context of web-based contracts[,] clarity and conspicuousness are a function of the design and content of the relevant interface." (internal quotation marks omitted)).

### A. "My Bag" Screen

The My Bag screen presents a relatively close call. Courts frequently find hybrid agreements enforceable where notice of the terms and conditions is spatially and temporally coupled with the mechanism for manifesting assent. *See Meyer*, 868 F.3d at 78. Here, there is no question that the "Pay Now" button is **temporally** coupled with the button for the Terms of Use and the disclosure that hitting "Pay Now" constitutes assent to those terms, as they appear on the same screen. Thus, a customer renting from a Redbox kiosk encounters the Terms of Use at the same time that she consummates the rental by making payment. However, the Court finds that "Pay Now" button is not **spatially** coupled with the Terms of Use.

Normally, courts will find a sufficient spatial connection where a consumer has an opportunity to review the terms and conditions in the form of a hyperlink placed directly adjacent to the button by which the consumer manifests assent. *E.g.*, *Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1098 (S.D. Cal. 2018); *Fteja*, 841 F. Supp. 2d at 840 ("Here, Fteja was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences."). In this case, however, the button for the Terms of Use and accompanying disclosure are not adjacent to the "Pay Now" button. Rather, the "Pay Now" button appears in the middle of the right side of the screen while the Terms of Use and disclosure appear at the bottom.

Moreover, there are two other buttons between the "Pay Now" button and the link to the Terms of Use. Those buttons perform functions entirely unrelated to the function by which a Redbox customer manifests assent to the Terms of Use—*i.e.*, making payment. In other cases where intervening buttons or links separate the mechanism for manifesting assent and the terms and conditions, those buttons provide alternative means of manifesting assent. For example, in *Selden v. Airbnb, Inc.*, No. 16-cv-00933 (CRC), 2016 WL 6476934 (D.D.C. Nov. 1, 2016), the consumer faced three buttons that would allow her to sign up for the service with Facebook, Google, or email. *Id.* at *9. The disclosure informing the user that he was agreeing to the linked terms and conditions by signing up appeared only below the email sign-up button. Nonetheless, the district court found that "any reasonably-observant user would notice the text and accompanying hyperlinks" even if he used a different means of signing up. *Id.* at *5. By contrast, in this case, the buttons between the "Pay Now" button and the Terms of Use link do not offer alternative means of payment. Rather, they allow a customer to sign in to their Redbox account or access promotional discounts. Those buttons, entirely unconnected to payment, have the effect of diverting the customer's attention from the Terms of Use and accompanying disclosure. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016) (finding that the numerous links on the webpage "generally obscure the message" intended to be conveyed by the notice of agreement to the terms and conditions).

The text immediately above the two intervening buttons further diverts the Redbox customer's attention from the Terms of Use. That text reads "Don't miss your perks!" A customer may justifiably believe that the three buttons below that text address "perks." Thus, a customer not interested in "perks" might not bother looking down to see the Terms of Use and disclosure that she is agreeing to those terms by hitting "Pay Now."

Finally, the two intervening buttons contribute to the general clutter of the My Bag screen. Along with those buttons are two navigational buttons on the left side of the screen, including the "Add Movie" button directly to the left of the Terms of Use button. The movies selected for rental are listed on the left side of the screen and fine print underneath sets forth certain terms of the rental. These additional buttons and text further dilute the effectiveness of the notification informing customers that hitting "Pay Now" represents asset to the Terms of Use. *Nicosia*, 834 F.3d at 237 ("[T]he presence of customers' personal address, credit card information, shipping options, and purchase summary are sufficiently distracting so as to temper whatever effect the notification has.").[1]

In short, because the link to the Terms of Use and the accompanying disclosure were not clearly and conspicuously displayed on the My Bag screen, customers renting at a Redbox kiosk did not have constructive notice that they were assenting to the Terms of Use when hitting the "Pay Now" button. Therefore, Wilson did not enter into the Terms of Use, including the mandatory arbitration provision, simply by renting a movie from a Redbox kiosk.

### B. "Sign In" Screen

Redbox also contends that Wilson assented to the Terms of Use by signing in to her Redbox account. The Sign In screen does not have the same clutter problem as the My Bag screen. Instead, the Sign In screen offers customers three different methods to sign in to their accounts. The customer also has the option to create an account. The bottom of the screen

---

[1] Redbox cites *Cain v. Redbox Automated Retail, LLC*, 136 F. Supp. 3d 824, 833 (E.D. Mich. 2015), to claim that other courts have found that Redbox's kiosk screen provides sufficient constructive notice of the Terms of Use. This Court has reviewed the relevant exhibit submitted in that case and finds that the kiosk screen at issue there was formatted differently from the one here. *Cain*, 2:12-cv-15014 (E.D. Mich.) (Dkt. No. 48-8). Unlike here, the payment screen at issue in *Cain* places a disclosure immediately below the payment button stating that "By pressing 'PAY' or 'USE CREDITS' you agree to the Terms." *Id.*

displays a disclosure informing customers that, by signing into their account, they are agreeing to Redbox's Terms of Use, Privacy Policy, and Rewards Terms. While the Sign In screen exhibits temporal coupling between the notice of Terms of Use and the mechanism for manifesting assent, there is some spatial decoupling caused by the prompt for new users to create an account, which separates the disclosure at the bottom of the screen from the Sign In buttons. If that were the only issue, the Court would not find this relatively minor spatial decoupling fatal in the conspicuousness evaluation. But other problems prevent this Court from finding the notification on the Sign In screen to be clear and conspicuous.

The main problem with the Sign In screen is that the hyperlink to the Terms of Use is not reasonably conspicuous. Courts have found links to terms and conditions insufficiently conspicuous where the "characteristics of the hyperlink raise concerns as to whether a reasonable user" would recognize the text as a hyperlink. *Cullinane*, 893 F.3d at 63; *see also Sgouros*, 817 F.3d at 1035 ("Where the terms are not displayed but must be brought up by using a hyperlink, courts . . . have looked for a clear prompt directing the user to read them."); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 764–65 (N.D. Cal. 2019). The hyperlinks that Wilson would have encountered appear in white text, which does provide some contrast with the surrounding gray text. At the same time, other non-hyperlink text on the Sign In screen appears in white. Using a different color for the hyperlink from the surrounding text, by itself, is not sufficient to render the hyperlink reasonably conspicuous. Indeed, "[c]oloring can be for aesthetic purposes. Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract." *Applebaum*, 263 F. Supp. 3d at 467. There must be some other distinguishing characteristic "to inform consumers that there was in fact a hyperlink that should be clicked and that a contract should be reviewed, such as words to that effect, underlining, bolding, capitalization, italicization,

or large font." *Id.*; *see also Cullinane*, 893 F.3d at 63 ("While not all hyperlinks need to have the same characteristics, they are commonly blue and underlined." (internal quotation marks omitted)).

Redbox's failure to add some additional distinguishing characteristic to the Terms of Use hyperlink is particularly glaring here, given that the Sign In page includes two other hyperlinks formatted differently from the Terms of Use hyperlink. Both the "FORGOT PASSWORD" and "JOIN REDBOX PERKS" hyperlinks feature characteristics that distinguish them from other text on the Sign In screen. Specifically, the hyperlinked text appears in all caps followed by the ">" symbol, suggesting to the user that clicking on the text will direct them to a new page. Viewing the Terms of Use hyperlink, in contrast with those more obvious hyperlinks, underscores that the Terms of Use hyperlink is not reasonably conspicuous. Finally, the Court finds the gray disclosure text surrounding the hyperlinks not reasonably conspicuous because there is insufficient contrast between the gray text and the black background. *See Cullinane*, 893 F.3d at 64 (finding the notification text to be inconspicuous where it "was displayed in dark gray small-sized non-bolded font against a black background"). For all these reasons, the Court finds that the disclosure on the Sign In screen failed to give Wilson constructive notice of the Terms of Use.

### C. Email Notice of 2016 Update

Even if the My Bag screen and the Sign In screen did not provide constructive notice of the Terms of Use, Redbox argues that Wilson received notice of the mandatory arbitration provision because she received an email from Redbox informing its customers of the November 2016 update to the Terms of Use. Redox contends that by continuing to use Redbox's services after receiving that email, Wilson assented to the new Terms of Use, including the mandatory arbitration provision.

In Illinois "[s]ilence may be construed as acceptance where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept." *Bauer v. Qwest Commc'ns Co.*, 743 F.3d 221, 228 (7th Cir. 2014) (internal quotation marks omitted). But here, Redbox has failed to present evidence showing that Wilson ever was aware of the Terms of Use—let alone assented to them.[2] Given that Wilson never previously assented to Redbox's Terms of Use when renting from Redbox, her history with Redbox did not suggest that she should have expected to receive an email adding new terms to her dealings with the company.[3] *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 126 (2d Cir. 2012) ("[T]hat someone has received an email does not without more establish that he or she should know that the terms disclosed in the email relate to a service in which he or she had previously enrolled and that a failure affirmatively to opt out of the service amounts to assent to those terms."). Thus, Redbox cannot show that Wilson's previous dealings with it would make it reasonable for Redbox to treat Wilson's silence in response to its email as an acceptance of the revised Terms of Use.

---

[2] Wilson has presented evidence that, as recently as September 30, 2018, Redbox's website featured a Sign In screen that did not include a notice of the Terms of Use. (Pl.'s Opp'n to Mot. to Compel, Ex. 3, Dkt. No. 17-4.) Notably, Redbox does not state when it first began using the Sign In screen it submitted as an exhibit in support of its motion. Instead, Redbox states that the My Bag screen has been used in substantially the same format since at least 2012. (Feldner Decl. ¶ 7.) In any case, even assuming that the Sign In screen described here was in effect prior to September 30, 2018, this Court has already held that neither that screen nor the My Bag screen provided constructive notice of the Terms of Use. To the extent Redbox used any other means to obtain assent to the Terms of Use during Wilson's time as a Redbox customer, it has failed to present any evidence of it.

[3] Redbox cites *Pincaro v. Glassdoor, Inc.*, No. 14-cv-423-RA, 2015 WL 765940 (S.D.N.Y. Feb. 23, 2015), to support its claim that a consumer who receives an email from a company notifying her of new terms and conditions manifests assent to those terms by continuing to use its services. In *Pincaro*, however, there was no dispute that the plaintiff had agreed to an earlier version of the defendant's terms and conditions. *Id.* at *2. Those terms and conditions included a clause allowing the defendant to modify the terms and conditions by providing notice of the updates on its website. *Id.* at *3. While there is a similar modification clause in Redbox's Terms of Use, (Feldner Decl., Ex. 1 at 3/26), Wilson never assented to the Terms of Use. Thus, in *Pincaro*, the consumer's assent to the earlier terms and conditions, including the modification clause, established a prior course of dealing absent here.

## CONCLUSION

In sum, the Court finds that Wilson never assented to Redbox's Terms of Use because neither the My Bag screen on Redbox's kiosks nor the Sign In screen on Redbox's website provided clear and conspicuous notice of those terms. Moreover, Wilson's mere receipt of an email from Redbox did not give rise to an agreement to arbitrate. Consequently, Wilson is not bound by Redbox's Terms of Use and its mandatory arbitration provision. Redbox's motion to compel arbitration and stay proceedings (Dkt. No. 12) is accordingly denied.

ENTERED:

Dated: March 25, 2020

Andrea R. Wood
United States District Judge